**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Ira S. Greene
Scott W. Reynolds

*Attorneys for the Petitioners*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| INVERNESS DISTRIBUTION LIMITED | : | Chapter 15 Case No. |
| f/k/a MORGAN CREEK INTERNATIONAL | : | |
| LIMITED, | : | 11-_____( ) |
| | : | |
| Company in a Foreign Proceeding. | : | |

-------------------------------------------------------------x

### DECLARATION OF CHARLES THRESH IN SUPPORT OF VERIFIED PETITION AND RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1504, 1515, 1517, 1519, 1520, AND 1521

I, Charles Thresh, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.     I am one of the Joint Provisional Liquidators (the "**JPLs**" or "**Petitioners**") of Inverness Distribution Limited ("**Inverness**" or the "**Company**"), appointed by the Supreme Court of Bermuda (the "**Bermuda Court**") to oversee the foreign proceeding, as defined in section 101(23) of title 11 of the United States Code (the "**Bankruptcy Code**"), of Inverness pending before the Bermuda Court under Matter No. 2011 No. 60 (the "**Bermuda Proceeding**"). I am authorized, as one of the foreign representatives of Inverness, as defined in Bankruptcy Code section 102(24), to commence a chapter 15 proceeding.

2.      I, along with my fellow Liquidator, Michael Morrison, am a managing director of KPMG Advisory Limited and a resident of Bermuda. I am an insolvency professional with over sixteen (16) years of experience in Bermuda, Australia and Europe.

3.      I hereby submit this declaration ("**Declaration**") in support of the *Verified Petition of Foreign Representatives Michael Morrison and Charles Thresh in Support of Application of Inverness Distribution Limited for Recognition of Foreign Main Proceeding Pursuant to 11 U.S.C. § 1517 and Seeking Related Relief* filed contemporaneously herewith on behalf of Inverness for recognition of a foreign main proceeding (the "**Verified Petition**") and for related relief pursuant to sections 1504, 1515, 1517, 1519, 1520 and 1521 of the Bankruptcy Code.

4.      I make this Declaration from my own personal knowledge and, where matters are not within my own personal knowledge, I understand them to be true from the sources indicated throughout, in particular, from my investigations and the investigations of my staff into the affairs of the Company, my administration and management of the Company and its assets and the documents I reviewed including documents annexed as exhibits to the Petition and Motion.

## BACKGROUND

### A.      Overview of Inverness and its Business

5.      Inverness is an exempted limited liability company incorporated under the laws of Bermuda with a registered office located at Crown House, 4 Par-la-Ville Road, Hamilton HM08, Bermuda.  Until March 2, 2011, Inverness' registered office was located at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda.  Inverness was incorporated on June 30, 2003 and, until its change of name on April 13, 2010, was registered as "Morgan Creek International Limited."  Inverness was created to enter into contractual relationships to distribute and

otherwise exploit the rights to various films outside of the United States, Canada and their respective commonwealths, territories and possessions (collectively, the "**Foreign Territory**").

6. Since July 28, 2004, Mr. James Robinson ("**Robinson**") has been the sole registered shareholder of Inverness.[1] Prior to the commencement of the Bermuda Proceeding, Robinson also actively served as the President and a Director of Inverness. Robinson is known in the film industry as the founder and Chief Executive Officer of Morgan Creek Productions, Inc. ("**MCP**"), a Delaware corporation. MCP appears to have been in business since 1988 and produced films such as "Young Guns," "Robin Hood: Prince of Thieves," "Last of the Mohicans," and "Ace Ventura: Pet Detective."[2]

7. Inverness' assets are comprised primarily of the contractual rights to distribute or otherwise exploit a library of films, largely produced by MCP, in the Foreign Territory (collectively, together or separately, the "**Rights**"). These Rights were acquired pursuant to assignment agreements with the producers of such movies (or assignees of such producers), including MCP and various Morgan Creek-related special purpose vehicle production companies in exchange for cash payments by Inverness. The exploitation of the Rights then takes place via distribution agreements (the "**Distribution Agreements**") with third parties, including Warner Brothers and NBC Universal, and through agents, such as Inverness' affiliate, MCI BV. The Distribution Agreements typically concern distribution to movie theatres, home video markets and, in some cases, television markets in certain Foreign Territories and entitle Inverness to payment from their contract counterparties.

---

[1] Inverness has an authorized share capital of 12,000 shares with a par value of $1.00 each.

[2] I have been advised by representatives of the Lenders (as defined below) that Robinson (i) was the sole Director and Shareholder of Morgan Creek International Limited (UK) ("**MCIL UK**"), a company incorporated in England and Wales, which was dissolved on 27 April 2010, and (ii) is a Director of Morgan Creek International B.V. ("**MCI BV**"), a company incorporated in the Netherlands.

8.     I have been advised that the cash payments received by Inverness under the Distribution Agreements are usually transferred to accounts (collectively, the "**Income Account**") at Société Générale in London held by the Agent (as defined below) in the name of Inverness and that the transfers are made through the New York branch of Société Générale.

B.     **The Credit Agreement**

9.     Inverness is the borrower under a US $150,000,000 Revolving Credit Facility Agreement, dated June 8, 2005, (as amended from time to time, the "**Credit Agreement**", attached hereto as Exhibit A), among Inverness[3], as borrower, Société Générale, as Arranger, Agent and Security Trustee (the "**Agent**"), and the original lenders named therein.  The current lenders under the Credit Agreement are the Agent, Santander UK plc, ING Bank N.V., The Governor and Company of the Bank of Ireland and Commerzbank AG, London Branch (collectively, the "**Lenders**").  The governing law of the Credit Agreement is English law.

10.    I have been advised by the Lenders that the purpose of the Credit Agreement was to refinance a prior facility with the Agent which, together with the prior facility, financed the acquisition, marketing and exploitation of the Rights, funded working capital requirements of Inverness and were intended to be used in connection with the acquisition of distribution rights in certain films, including after-acquired films, in the Foreign Territory.  Pursuant to and as security for the loans made under the Credit Agreement (as further detailed below), all funds due to Inverness pursuant to Distribution Agreements are to be paid into an Income Account held by the Agent in England via the Agent's New York Branch.

11.    The last date for Inverness to draw down new loans under the Credit Agreement lapsed on August 10, 2009.  The date on which all loans made under the Credit Agreement,

---

[3]     As mentioned above, Inverness was formerly known as Morgan Creek International Limited, and executed the Credit Agreement under such name.

regardless of the applicable interest period as designated in any relevant drawdown notice, must be repaid, absent acceleration, is August 10, 2011 (the "**Maturity Date**"). As of the commencement of the Bermuda Proceeding, Inverness was indebted to the Lenders in the aggregate amount of US $74,060,398.83 which remains due and owing, exclusive of interest, fees and expenses, which also remain due and owing under and in accordance with the Credit Agreement.

C.     Security under the Credit Agreement

12.     The Lenders' rights under the Credit Agreement have been secured. In accordance with Clause 3 of the Credit Agreement, Inverness entered into a Security Assignment and Charge, dated June 8, 2005 (the "**Charge**"), with the Agent as Security Trustee for the Lenders. By virtue of the Charge, Inverness assigned all of its rights and interests in its assets described in the Credit Agreement, as set out in Clause 3.1(b) of the Charge to the Agent as Security Trustee for the Lenders. These rights and interests include, but are not limited to, all of its rights to distribute, lease, license, sell, exhibit, broadcast or otherwise deal with its catalogue of films and the benefit of all distribution agreements and all income and proceeds from its catalogue of films

13.     Inverness, pursuant to the Charge, also assigned all of its right, title and interest in its "Bank Accounts"[4] (including the Income Account) and all moneys standing to the credit thereof; all receivables and all benefits, rights and security held in respect of, or to secure payment of the receivable; and all present and future business, undertaking and assets which may

---

[4]     "Bank Accounts" is defined in the Credit Agreement to mean any bank accounts held in the name of Inverness or which Inverness is beneficially entitled to in respect of any film.

not have been effectively mortgaged, charged by way of fixed charge or assigned above.[5]  All of the above security documents are registered at the Bermuda Register of Companies in accordance with the Bermuda Companies Act 1981 (the "**Companies Act**").

14.     The Credit Agreement further provides that Inverness is required to deliver to the Agent certified copies of each of the fully-executed Distribution Agreements, including any subsequently entered into, and that Inverness is prohibited from amending or varying the Distribution Agreements in any manner which would affect the amount, timing or conditions of any payment into the Income Account.

**D.     Borrowing Base**

15.     The Credit Agreement includes a mandatory prepayment trigger based on a calculation referred to as the "Borrowing Base" (the "**Borrowing Base**").  The Borrowing Base represents an aggregate of a formulaic valuation of Inverness, the Rights, its other assets, sales forecasts and other factors.  The purpose of the Borrowing Base is to ensure that the amount loaned under the Credit Agreement does not exceed a certain proportion of the assets of Inverness over which the Lenders have security.

16.     The Credit Agreement obligated Inverness to deliver to the Agent a certificate each month calculating the Borrowing Base as of the end of the previous month.  Based upon the Borrowing Base certificate, the Agent had the right to require Inverness to make payments or take such other actions to ensure that the outstanding balance under the Credit Agreement did not

---

[5]     There are also seven Supplemental Security Assignments entered into on February 28, 2006, August 10, 2006, September 22, 2006, September 29, 2006, May 18, 2007, May 18, 2007 and December 6, 2007, respectively.  These were entered into in accordance with the Charge and the Credit Agreement in order to secure the rights in respect of additional films so that their value could be permitted to be included in the "Borrowing Base" (as defined below) calculations.

proportionally exceed the Lenders collateral.  Clause 8.5 of the Credit Agreement specifically

provides:

> In the event that following any re-calculation of the Borrowing Base by the Agent
> pursuant to Clause 2.5, the Agent shall determine in its sole discretion that the
> aggregate of the outstanding Loans at such time exceeds or, upon the making of a
> Loan then requested by the Borrower, will exceed the amount of the Borrowing
> Base, the Borrower shall immediately upon receipt of such notification from the
> Agent pay to the Agent such amount as is necessary to eliminate such excess or
> the amount of the Loan then requested by the Borrower shall be deemed to be
> reduced to such amount as shall not cause such excess.

Failure to provide the Borrowing Base certificates is a material breach of the Credit Agreement

and qualifies as an event of default thereunder.

**E.**      **Other Debts**

17.      Inverness has other debts, principally (i) participations and residuals payable

relating to contractual obligations within production agreements to disburse funds to film

participants and to appropriate guilds for the use of their personnel and (ii) a note payable to the

Directors Guild of America, Inc., Screen Actors Guild, Inc. and Writers Guild of America, Inc.,

for itself and on behalf of Writers Guild of America East, Inc.

18.      MCP and other Robinson-controlled entities have also asserted claims against

Inverness.  It is my understanding that payment on most of these debts are past-due.

**F.**      **Events Leading to the Bermuda Proceeding**

19.       Between February 26, 2010 and January 25, 2011, the Agent sent a number of

letters of demand to Inverness notifying it of certain breaches of the Credit Agreement and

demanding mandatory prepayment on the grounds that the Borrowing Base certificates delivered

by Inverness showed that the aggregate of the outstanding loans under the Credit Agreement

greatly exceeded the amount of the Borrowing Base. Inverness failed to make the payment

demanded in such letters.

20.     As of February 26, 2010, the shortfall in the Borrowing Base was US $15,082,041.  Per a Borrowing Base certificate delivered by Inverness and dated December 31, 2010, the shortfall in the Borrowing Base had increased to US $25,297,448, which sum was demanded in a letter from the Agent to the Company, dated January 25, 2011.  Since that time, the shortfall in the Borrowing Base has further increased to $30,478,176, as shown in the Borrowing Base certificate delivered by Inverness and dated January 31, 2011.

21.     The failure to make the demanded mandatory prepayment, as well as the failure to provide information required in the letters from the Agent referenced above, constituted an "Event of Default" as set forth Clause 14.1 of the Credit Agreement, which entitled the Agent to declare that all or part of the loans and other sums to be immediately due and payable and to enforce the security granted in accordance with the Credit Agreement and the Charge.

22.     I have been advised by representatives of the Lenders that they believe Inverness' previous management has failed to provide copies of any new Distribution Agreements to the Agent for at least two years.  The Lenders believe that it is improbable that no Distribution Agreements have been entered into by Inverness during this time. [6]  In turn, the Lenders have no way of knowing precisely what Distribution Agreements Inverness has entered into or whether these Distribution Agreements are on appropriate commercial terms allowed under the Credit Agreement.  These Distribution Agreements may be expiring and due for renegotiation without the Agent's knowledge (and despite the fact that the Agent is entitled to participate on such negotiations) and may be on unfavorable terms which may affect the Lenders' right to payment.  More importantly, the Petitioners have no way of knowing whether payments under all of the Distribution Agreements, especially those that may not have been disclosed by Inverness'

management, are being accounted for and paid into the Income Account as required by the Credit Agreements. The failure to provide the Agent with new Distribution Agreements and to make the Agent aware that new Distribution Agreements have been entered into, are defaults under the Credit Agreement.

23. In addition, in the months leading up to the Bermuda Proceeding, Inverness' projections as to the amounts payable by various major United States studios for their exploitation of television and home video rights experienced a dramatic and unexplained decline. These royalty amounts comprise a significant portion of the collateral under the Credit Agreement. For a certain library of films, the decline was as high as 71% for the last quarter of 2010. Other libraries showed a decline of 36% over a similar period.

24. According to representatives of the Lenders, this type of decline is very unusual in the market and raised concerns as to the credibility of the information that had been produced by Inverness' management. Further, Inverness refused to provide sufficient explanation regarding these dramatic declines. These facts suggest Inverness had not been forthright with the Agent or has not taken its financial reporting seriously, which would also constitute a breach of the Credit Agreement.

25. Prior to the commencement of the Bermuda Proceeding, the Agent sent a number of letters of demand to Inverness notifying it of certain breaches of the Credit Agreement and demanding mandatory prepayment on the grounds that the Borrowing Base certificates delivered by Inverness showed that the aggregate of the outstanding loans under the Credit Agreement greatly exceeded the amount of the Borrowing Base. Moreover, it was clear that receivables were stagnant and had not been pursued for many months.

---

[6] Indeed, the appearance of certain payments into the Income Account evidences that Inverness has, in fact, entered into new Distribution Agreements, but has failed to provide these agreements to the Agent as

26.     On or about January 25, 2011, due to the numerous payment and other defaults of Inverness, the Agent issued a notice of default accelerating the aggregate principal and interest outstanding on all loans under the Credit Agreement.  Accordingly, US $74,060,398.83 is now due and owing under the Credit Agreement.  These amounts remain outstanding and unpaid by Inverness despite its obligations under the Credit Agreement.

27.     The failure to pay the amounts past due and owing under the Credit Agreement, as well as the failure to provide information to the Agent, including copies of new Distribution Agreements, each constitute an event of default under the Credit Agreement, entitling the Agent to enforce the security granted to the Lenders under the Charge.

**G.     <u>Appointment of Joint Provisional Liquidators</u>**

28.     Prior to the commencement of the Bermuda Proceeding, the Agent had serious concerns about the management of the Company, including:

(a)     the insolvent state of the Company;

(b)     the intangible and easily transferrable nature of the Company's assets;

(c)     the lack of information given to the Agent by the Company in relation to distribution agreements and financial matters (such as the Company's valuation of components of the Borrowing Base) in breach of the Credit Agreement;

(d)     a dramatic write down in the value of receivables in the Company's Borrowing Base certificates suggesting either that the Company had grossly overvalued those income streams at the time the Credit Agreement was made or that the Company's management was not carrying out its financial reporting responsibilities properly and was not being frank with the Agent;

---

required under the Credit Agreement.

(e)     the apparent failure of the Company to collect aging receivables which suggested that Robinson and the Company's management were not carrying out their responsibilities to the Company or its creditors properly; and

(f)     the change in the Company's name in April 2010, following the Agent's demands in respect of breaches of the Credit Agreement, to a name completely different to those of its affiliates, without any explanation.

29.     On February 28, 2011, the Agent petitioned the Bermuda Court to commence winding-up proceedings for Inverness and for the appointment of Michael Morrison and I as the JPLs for Inverness.   The Bermuda Court entered an order that same day,[7] granting the Agent's request and empowering the JPLs for Inverness to, among other things:

(a)     ascertain the assets of the Company and their situs and take all steps necessary to secure the assets of the Company in whichever jurisdiction they may be situated, including commencing Court actions where appropriate, to obtain possession of such assets, including, bringing the same under their control and further, where appropriate, to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located, including commencing appropriate proceedings under the Bankruptcy Code and applying for relief in those proceedings;

(b)     continue the business of the Company under the supervision of the Bermuda Court in so far as is necessary to preserve value of the Company to carry on all or any portion of the business of the Company so far as may be necessary for the beneficial winding-up of the Company;

(c)     review, secure, take possession of and copy any and all books, papers, writings, financial records, documents and records relating to the accounts and audit

of the Company's accounts that are located in the offices of its auditors or management or any other person both in this jurisdiction and in any other jurisdiction;

(d)     see, review, secure, take possession of and copy the claims and financial records of the Company that are located in the offices of the shareholder of the Company, any company affiliated with the Company or any other person;

(e)     conduct such investigations and obtain such information as is necessary to locate, discover the status of, protect, secure, take possession of, collect the assets and determine the liabilities of the Company, or to enable these proceedings to move forward in an expeditious manner;

(f)     bring or defend any action or other legal proceedings in the name and on behalf of the Company; and

(g)     do all such things as may be necessary or expedient for the protection of the Company's assets or property.

30.     By filing the winding-up petition, Inverness became subject to the Bermuda Court and is currently under its supervision for the duration of the Bermuda Proceeding.

**H.     Steps Taken By JPLs**

31.     Since our appointment as JPLs, Michael Morrison and I have taken control of Inverness and have run the business of the Company from its registered headquarters in Hamilton, Bermuda.

32.     To this end, the JPLs have taken numerous steps to preserve the assets of Inverness for the benefit of its creditors. These steps include, but are not limited to:

(a)     opening bank accounts in the name of Inverness, as Inverness' duly appointed JPLs;

---

[7]     A copy of this order is attached to the Verified Petition as Exhibit A.

(b)     sending notice of the JPLs' appointment to all known creditors and parties in interest;

(c)     seeking, requesting and reviewing numerous documents related to Inverness and its financial position;

(d)     beginning an in-depth review of the Company's financial affairs and its books and records;

(e)     engaging outside professionals to assist the JPLs with the Company's affairs and assets;

(f)     dealing with numerous parties in interest on behalf of Inverness, including but not limited to Robinson, MCP's agents and employees, representatives of the various film employee guilds, distributors and the Company's representatives;

(g)     guiding the Company's negotiations in various disputes related to the Distribution Agreements it is currently a party to;

(h)     holding meetings of stakeholders;

(i)     entering into contracts on behalf the Company;

(j)     beginning the process of marshalling the assets of the Company for eventual sale for the benefit of its creditors; and

(k)     generally managing Inverness's affairs and business.

## **RELIEF REQUESTED**

33.    Under the oversight of the JPLs and the Bermuda Court, with the ancillary assistance of this Court, the ultimate goal of the Company is to satisfy, as far as possible, the claims of its creditors and to try to preserve the value of it assets to the extent possible until they can be liquidated in an orderly fashion to satisfy the claims of creditors.

34.     To effectuate this goal, the JPLs respectfully request the assistance of the Court to bind creditors in the United States to the Bermuda Proceeding and to prevent the distribution of the Company's property on a basis inconsistent with the regime applicable to the JPLs' conduct of the Company's affairs through the Bermuda Proceeding.

35.     It is my belief that the relief requested herein is necessary to give effect to the Bermuda Proceeding in the United States, protect Inverness' assets in the United States, and to prevent creditors and other parties in interest in the United States from taking actions that may frustrate the Bermuda Proceeding.  Moreover, the relief requested in the Verified Petition and other pleadings filed contemporaneously herewith will best assure an economical, expeditious and fair administration of Inverness's business.

36.     I am advised that, under Section 167 of the Companies Act in Bermuda, dispositions in the Company's property pursuant to the Distribution Agreements are void after commencement of the Bermuda Proceeding.  However under US bankruptcy law, I am advised that a liquidator would not be able to avoid such transactions unless they occurred after he had obtained appropriate relief under chapter 15 and other related provisions of the Bankruptcy Code.  The commencement of the Bermuda Proceeding alone in Bermuda may not therefore protect the Company's assets in respect of dispositions under the Distribution Agreements taking place in the United States or outside the jurisdiction of Bermuda's courts.  Therefore, the relief sought in the Verified Petition and other pleadings filed contemporaneously herewith will ensure that claims of all creditors will be processed in an orderly and equitable manner.

37.     The relief sought will reasonably assure the just treatment of all creditors, as creditors in the United States will not be prejudiced or unduly inconvenienced in the processing of claims in accordance with the priorities in effect in Bermuda.

38.     I am informed and believe that the factual allegations contained in this Declaration are true and accurate to the best of my knowledge, information and belief.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Executed this 3rd day of May 2011

Hamilton, Bermuda

By: _____
Charles Thresh, as Joint Provisional
Liquidator for Inverness

Signature Page for Thresh Declaration